UNITED STATES DISTRICT COURT
WESTERN DISTRICT TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| **RICSUNG INTERNATIONAL LIMITED, and** | ) | |
| **FUIJAN MINHOU MINXING WEAVING** | ) | |
| **CO., LTD.** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **vs.** | ) | **Civ. Action No. 1:08-cv-01213-JDB** |
| | ) | |
| **XEBEX CORPORATION, a/k/a** | ) | |
| **TETRA PACIFIC  CORPORATION, and** | ) | |
| **SCOTT N. WEINERT, individually** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| | ) | |
| | ) | |

## AMENDED COMPLAINT

Ricsung International Limited ("Ricsung") and Fuijan Minhou Minxing Weaving Co., Ltd. ("Minxing") for their Amended Complaint against, Xebex Corporation ("Xebex") and Scott N. Weinert ("Weinert") assert the following.

### JURISDICTION AND VENUE

1.      Ricsung International Limited is a British Virgin Islands corporation with its initial registered office located at Unit 3, 20th Floor, Golden Centre, 188 Des Voeux Road Central, Hong Kong and its principal place of business located at Flat A, 4th Floor, Blk. 2, Sunny Villa, 218-240 Castle Peak Road, Ting Kau, N.T. H.K.

2.      Fuijan Minhou Minxing Weaving Co., Ltd. is a Chinese corporation with its principal place of business located at #56 XianShanBian, Baisha Town, Minhou County, Fuzhou, Fuijan, China.

3.      Xebex is a Nevada corporation with its principal office located at 502 East John Street, Carson City, NV 89706 and is licensed to transact business in the State of Tennessee as a foreign corporation with its principal place of business in Tennessee located at 26 Windy City Road, Jackson, Tennessee.  Tetra Pacific Corporation is an assumed name under which Xebex is authorized to transact business in the State of Tennessee.

4.      Weinert is a resident of the State of Tennessee and resides as 26 Windy City Road, Jackson, Tennessee.

5.      The amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(2).

7.      Venue is proper under 28 U.S.C. § 1391(a)(1) and (2) because (i) the Defendant, Xebex corporation, resides in the Western District of Tennessee in that its principal place of business is located therein; (ii) Weinert is a resident of the State of Tennessee; (iii) a substantial part of the events giving rise to the claim occurred in the Western District of Tennessee; and (iv) the defendant corporation resides in the Western District of Tennessee pursuant to 28 U.S.C. §1391(c) because its contacts with the Western District of Tennessee would be sufficient to subject it to personal jurisdiction in this district.

<u>FACTS</u>

8.      In or about December 2006, Ricsung and Xebex began a business relationship whereby Xebex would forward a purchase order (PO) from its customer, almost exclusively Kirkland's, to Ricsung for it to fulfill.

9.      Ricsung, in turn, would place orders and, in many instances, issue its own purchase orders to factories located in China, including without limitation Minxing, for the production of the goods represented by the Kirkland's and/or Xebex POs.

10.     The factories would fulfill the orders arranged by Ricsung and submit their invoices directly to Xebex.

11.     An agreement exists between Ricsung and Xebex the terms of which are:  Xebex would increase the amount charged by a manufacturer (the "Factory Cost") by two percent (2%) to arrive at a "First Cost" figure which Xebex would submit to Kirkland's. Per the agreement with Kirkland's, an "Agent Fee" (usually 8% of the First Cost) was then added to the First Cost to arrive at a "Total First Cost" amount per unit in each particular PO.  Upon receipt of payment from Kirkland's, Xebex would retain the 2% increase above the Factory Cost and remit to Ricsung the balance of the Total First Cost.  Ricsung would then retain its Agent Fee and remit to the factories the remaining balance which was the Factory Cost amount to which the factories were entitled, at which time all parties would then have received payment in full.

12.     Beginning in early 2007, Xebex, having received full payment from Kirkland's, failed and refused to remit to Ricsung the balance of the Total First Cost less Xebex's agreed upon retained percentage. During this time, Xebex retained amounts far in excess of its allocated percentage and consistently remitted amounts to Ricsung far less than even the Factory Cost. This continued through approximately July 2008 at which time Minxing refused to release any further shipping containers to Xebex or Kirkland's as a result of the non-payment.

13.     Additionally, in certain instances, Ricsung was forced to remit the Factory Cost directly to the factories that produced and shipped the goods despite not having received the balance of the Total First Cost from Xebex.

14.     In the course of dealing among the parties, Xebex at various times acknowledged the existence of the outstanding indebtedness to the Plaintiffs both verbally and through written communications.

15.     On or about July 10, 2008, Xebex caused a purported Irrevocable Standby Letter of Credit (the "First SBLC") from HSBC Bank in the face amount of $2 million (USD) to be issued to Minxing to satisfy a portion of the outstanding indebtedness.

16.     Minxing attempted to draw upon the First SBLC but was advised by its bank, China Trust, on July 22, 2008, that it would not honor the First SBLC because the First SBLC was not a legitimate standby letter of credit issued by HSBC Bank.

17.     Minxing contacted Xebex to inquire as to the discrepancy and was advised that another irrevocable standby letter of credit of like dollar amount would be issued (the "Second SBLC").

18.     On July 25, 2008, Xebex advised Minxing that the Second SBLC had been forwarded to China Trust.

19.     Again, China Trust advised that it had not received the Second SBLC and would not accept another standby letter of credit from the same applicant and would only consider a standby letter of credit issued in the proper format and communicated in accordance with proper banking procedures from HSBC bank.

20.     As a result of the above failures of Xebex to remit full payments, the Plaintiffs are owed (i) approximately $1,543,000 in Agent Fees to Ricsung; and (ii) $1,090,000 in Factory Cost actually paid by Ricsung to factories (other than Minxing); and (iii) approximately $3,387,000 in Factory Cost currently outstanding and owing to Minxing.

21.     Minxing produced and shipped goods as a result of orders originated by Xebex and processed by Ricsung which goods, upon information and belief, were received, accepted and paid for in full by Kirkland's.  Minxing, however, has not been paid for said goods and is owed the approximate sum of $3,387,000.

4

22.     Demand has been made upon Xebex for payment of these sums.

23.     Weinert is the one hundred percent (100%) owner of Xebex.

24.     Weinert is the President and Treasurer of Xebex and there are no other officers of the company.

25.     Weinert exercised exclusive control over the finances of Xebex and determined which bills of Xebex were to be paid and when they were to be paid.

26.     At a time when Xebex was insolvent, Weinert was paying the bills of other companies in which he held an interest and caused Xebex to funnel two million dollars ($2,000,000.00) to RR David Company, a company based in the Philippines which he and Rowena David (his paramour) owned.

27.     At a time when Xebex was insolvent, Weinert periodically deposited corporate checks payable to Xebex into his personal account.

28.     At a time when Xebex was insolvent, Weinert caused Xebex to spend $180,000.00 in building improvements to his barn and arena at his personal residence.

29.     At a time when Xebex was insolvent, Weinert caused Xebex, to sell receivables owned by Xebex and specifically directed that the proceeds of the sale be transferred to his personal account.

30.     At a time when Xebex was insolvent, Weinert personally owed Xebex large sums of money including, without limitation, at least $322,000.00 as of December 31, 2009.

31.     At a time when Xebex was insolvent, Weinert caused Xebex to purchase vehicles which were given to Weinert's family members as birthday presents or used by Weinert's children.

32.     At a time when Xebex was insolvent, Weinert conveyed property titled in Xebex to his now ex-wife as part of his divorce.

33.     At a time when Xebex was insolvent, Weinert also withdrew more than $450,000 in cash from Xebex in 2009 and caused Xebex to pay $80,000.00 to his now ex-wife during this time period.

34.     At a time when Xebex was insolvent, Weinert caused Xebex to reclassify certain transactions between him and Xebex in 2009 resulting in an $850,000.00 "reduction" in the amount Weinert allegedly owes Xebex.

35.     At a time when Xebex was insolvent, upon information and belief, Weinert withdrew large sums of cash for trips abroad, commingled Xebex funds and personal funds, used Xebex funds to support a venture in Texas which ultimately filed bankruptcy and which venture's assets were sold to a company which Weinert then went to work for.

36.     Weinert, individually, has disregarded virtually every corporate formality and utilized Xebex and its assets as his personal bank account funding his lavish personal endeavors, purchases of assets and making hundreds of thousands of dollars in improvements to real property owned by him, and payments to his ex-wife out of the company's account all of which are unrelated to Xebex's business.

## PART I

Ricsung alleges the following causes of action:

## COUNT I

### BREACH OF CONTRACT

37.     Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

38.     Ricsung, arranged for the sale of goods to Xebex and/or its customer Kirkland's from December 2006 to July 2008.

39.     Xebex has breached its agreement with Ricsung by failing to pay for the goods it or its customer have received and for which Xebex has been paid.

40.     Xebex has breached its agreement with Ricsung by failing to pay to Ricsung the Agent Fee for the goods it or its customer have received and for which Xebex has already been paid by Kirkland's

41.     As of August 12, 2008, the amount due and owing by Xebex to Ricsung for Agent Fees is approximately $1,543,000.00.

42.     As of August 12, 2008, the amount due and owing by Xebex to Ricsung for Factory Cost actually paid by Ricsung to factories other than Minxing is $1,090,000.00.

43.     As of August 12, 2008, the amount due and owing by Xebex to Ricsung and/or Minxing for Factory Cost currently outstanding and owing to Minxing is approximately $3,387,000.00.

44.     Upon demand, Xebex has failed to pay the amounts due.


## COUNT II

### REPAYMENT FOR GOODS SOLD AND DELIVERED

45.     Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

46.     Ricsung, arranged for the sale of goods to Xebex and/or its customer Kirkland's from December 2006 to July 2008

47.     As of August 12, 2008, the amount due and owing by Xebex to Ricsung for Factory Cost actually paid by Ricsung to factories other than Minxing is $1,090,000.00.

48.     As of August 12, 2008, the amount due and owing by Xebex to Ricsung for Factory Cost currently outstanding and owing to Minxing is approximately $3,387,000.00.

49.     Upon demand, Xebex has failed to pay the amounts due.

## COUNT III

### CONVERSION

50.     Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

51.     By causing the transfers of goods from Ricsung and its suppliers, and by accepting the goods and receiving payment in full itself, Xebex wrongfully exerted dominion over the funds of the Plaintiffs, wrongfully converting their property and permanently depriving Plaintiffs of the use and enjoyment of the property.  By reason of the conversion of goods Ricsung has been damaged in an amount according to proof, and is entitled to recover that amount, with interest, from Xebex.

## COUNT IV

### UNJUST ENRICHMENT

52.     Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

53.     By causing the transfers of goods from Ricsung and its suppliers, and by accepting the goods and receiving payment in full itself, Xebex knowingly, and with specific intent to do so, has been unjustly enriched.

54.     By reason of the receipt of goods without payment to Ricsung or its suppliers therefore, Xebex has been unjustly enriched and Ricsung and/or Minxing have been damaged in an amount according to proof but not less than the Factory Cost of the goods produced and delivered, and are entitled to recover that amount, with interest, from Xebex.

55.     Xebex has been unjustly enriched by Ricsung's payment to the suppliers other than Minxing that totals at least the sum of $1,090,000.00.

56.     Xebex has been unjustly enriched by its having received the benefit of Ricsung's services, for which Ricsung charged an agent fee, without it having paid for such services.

<u>COUNT V</u>

**PIERCING THE CORPORATE VEIL**

57.     Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

58.     Weinert exercised complete dominion over Xebex's finances and its policies and business practices.

59.     Weinert is the one hundred percent (100%) owner of Xebex.

60.     Weinert is the President and Treasurer of Xebex and there are no other officers of the company.

61.     Weinert determined which bill of Xebex were to be paid and when they were to be paid.

62.     Weinert used his dominion and control over Xebex (i) to commit fraud or wrong, (ii) to perpetuate the violation of a statutory or other positive legal duty, or (iii) a dishonest and unjust act in contravention of Ricsung's rights as a creditor of Xebex.

63.     At a time when Xebex was insolvent, Weinert was paying the bills of other companies in which he held an interest and caused Xebex to funnel two million dollars ($2,000,000.00) to RR David Company, a company based in the Philippines which he and Rowena David (his paramour) owned.

64.     At a time when Xebex was insolvent, Weinert periodically deposited corporate checks payable to Xebex into his personal account.

65.     At a time when Xebex was insolvent, Weinert caused Xebex to spend $180,000.00 in building improvements to his barn and arena at his personal residence.

66.     At a time when Xebex was insolvent, Weinert caused Xebex to sell receivables owned by Xebex and specifically directed that the proceeds of the sale be transferred to his personal account.

67.     At a time when Xebex was insolvent, Weinert personally owed Xebex large sums of money including, without limitation, at least $322,000.00 as of December 31, 2009.

68.     At a time when Xebex was insolvent, Weinert caused Xebex to purchase vehicles which were given to Weinert's family members as birthday presents or used by Weinert's children.

69.     At a time when Xebex was insolvent, Weinert conveyed property titled in Xebex to his now ex-wife as part of his divorce.

70.     At a time when Xebex was insolvent, Weinert also withdrew more than $450,000 in cash from Xebex in 2009 and caused Xebex to pay $80,000.00 to his now ex-wife during this time period.

71.     At a time when Xebex was insolvent, Weinert caused Xebex to reclassify certain transactions between him and Xebex in 2009 resulting in an $850,000.00 "reduction" in the amount Weinert allegedly owes Xebex.

72.     At a time when Xebex was insolvent, upon information and belief, Weinert withdrew large sums of cash for trips abroad, commingled Xebex funds and personal funds, used Xebex funds to support a venture in Texas which ultimately filed bankruptcy and which venture's assets were sold to a company which Weinert then went to work for.

73.     Weinert's control and breach of duty proximately caused the injuries and losses to Ricsung.

74.     Weinert's use of Xebex and its assets as his personal bank account and effectively prevented Xebex from being able to satisfy the debts owed to Ricsung.

75.     Weinert, individually, has disregarded virtually every corporate formality and utilized Xebex and its assets as his personal bank account funding his lavish personal endeavors, purchases of assets and making hundreds of thousands of dollars in improvements to real property owned by him, and payments to his ex-wife out of the company's account all of which are unrelated to Xebex's business.

76.     Weinert should be held personally liable for the debt owed to Ricsung under a corporate veil piercing theory.

## COUNT VI

## ALTER EGO LIABILITY

77.     Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

78.     Weinert exercised complete dominion over Xebex's finances and its policies and business practices.

79.     Weinert is the one hundred percent (100%) owner of Xebex.

80.     Weinert is the President and Treasurer of Xebex and there are no other officers of the company.

81.     Weinert determined which bill of Xebex were to be paid and when they were to be paid.

82.     Weinert used his dominion and control over Xebex (i) to commit fraud or wrong, (ii) to perpetuate the violation of a statutory or other positive legal duty, or (iii) a dishonest and unjust act in contravention of Ricsung's rights as a creditor of Xebex such that the separate corporate existence of Xebex should be disregarded and Weinert should be considered its alter ego and liable for its debts.

83.     At a time when Xebex was insolvent, Weinert was paying the bills of other companies in which he held an interest and caused Xebex to funnel two million dollars ($2,000,000.00) to RR David Company, a company based in the Philippines which he and Rowena David (his paramour) owned.

84.     At a time when Xebex was insolvent, Weinert periodically deposited corporate checks payable to Xebex into his personal account.

85.     At a time when Xebex was insolvent, Weinert caused Xebex to spend $180,000.00 in building improvements to his barn and arena at his personal residence.

86.     At a time when Xebex was insolvent, Weinert caused Xebex to sell receivables owned by Xebex and specifically directed that the proceeds of the sale be transferred to his personal account.

87.     At a time when Xebex was insolvent, Weinert personally owed Xebex large sums of money including, without limitation, at least $322,000.00 as of December 31, 2009.

88.     At a time when Xebex was insolvent, Weinert caused Xebex to purchase vehicles which were given to Weinert's family members as birthday presents or used by Weinert's children.

89.     At a time when Xebex was insolvent, Weinert conveyed property titled in Xebex to his now ex-wife as part of his divorce.

90.     At a time when Xebex was insolvent, Weinert also withdrew more than $450,000 in cash from Xebex in 2009 and caused Xebex to pay $80,000.00 to his now ex-wife during this time period.

91.     At a time when Xebex was insolvent, Weinert caused Xebex to reclassify certain transactions between him and Xebex in 2009 resulting in an $850,000.00 "reduction" in the amount Weinert allegedly owes Xebex.

92.     At a time when Xebex was insolvent, upon information and belief, Weinert withdrew large sums of cash for trips abroad, commingled Xebex funds and personal funds, used Xebex funds to support a venture in Texas which ultimately filed bankruptcy and which venture's assets were sold to a company which Weinert then went to work for.

93.     Weinert's control and breach of duty proximately caused the injuries and losses to Ricsung.

94.     Weinert's use of Xebex and its assets as his personal bank account and effectively prevented Xebex from being able to satisfy the debts owed to Ricsung.

95.     Weinert, individually, has disregarded virtually every corporate formality and utilized Xebex and its assets as his personal bank account funding his lavish personal endeavors,

purchases of assets and making hundreds of thousands of dollars in improvements to real property owned by him, and payments to his ex-wife out of the company's account all of which are unrelated to Xebex's business.

96.     As a result of Weinert's disregard of the separate corporate existence of Xebex he should be considered its alter ego and held personally liable for its debts.

## COUNT VII

## FRAUD

97.     Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

98.     Ricsung alleges that Weinert caused Xebex to transfer its property, funds and assets to third parties at a time when Xebex was insolvent or with the intention of rendering Xebex insolvent such that Xebex would be unable to satisfy its outstanding obligations to Ricsung.

99.     As alleged above, Weinert exercised complete dominion over Xebex's finances and its policies and business practices.

100.     Weinert is the one hundred percent (100%) owner of Xebex.

101.     Weinert is the President and Treasurer of Xebex and there are no other officers of the company.

102.     Weinert determined which bill of Xebex were to be paid and when they were to be paid.

103.     Weinert used his dominion and control over Xebex (i) to commit fraud or wrong, (ii) to perpetuate the violation of a statutory or other positive legal duty, or (iii) a dishonest and unjust act in contravention of Ricsung's rights as a creditor of Xebex.

14

104.    The transfers of funds and property of Xebex orchestrated by Weinert were clearly in fraud of Xebex's creditors and Weinert, as the sole shareholder, officer and person with decisional control over Xebex's business decisions is liable for the fraud perpetrated against Ricsung.

## PART II

Minxing alleges the following causes of action:

## COUNT I

### BREACH OF CONTRACT

105.    Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

106.    Minxing produced and shipped goods arranged by Ricsung pursuant to orders from Xebex and/or its customer Kirkland's from December 2006 to July 2008.

107.    In certain instances Xebex submitted purchase orders directly to Minxing.  Xebex has breached its agreement with Minxing by failing to pay the invoices for the goods it or Kirkland's have received.

108.    As of August 12, 2008, the amount due and owing by Xebex to Minxing for Factory Cost currently outstanding and owing to Minxing is approximately $3,387,000.00.

109.    Upon demand, Xebex has failed to pay the amounts due.

## COUNT II

### REPAYMENT FOR GOODS SOLD AND DELIVERED

110.    Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

111.    Ricsung, arranged for the sale of goods to Xebex and/or its customer Kirkland's from December 2006 to July 2008 which goods were produced by Minxing.

112.    As of August 12, 2008, the amount due and owing by Xebex to Minxing for Factory Cost currently outstanding and owing to Minxing is approximately $3,387,000.00.

113.    Upon demand, Xebex has failed to pay the amounts due.

## COUNT III

### CONVERSION

114.    Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

115.    By causing the transfers of goods from Minxing, and by accepting the goods and receiving payment in full itself, Xebex wrongfully exerted dominion over the funds of Plaintiffs, wrongfully converting their property and permanently depriving the of the use and enjoyment of the property.  The conversion constitutes willful and malicious injury by Xebex to Minxing and its property.

116.    By reason of the conversion of goods Minxing has been damaged in an amount according to proof but not less than the Factory Cost of the goods produced and delivered, and is entitled to recover that amount, with interest, from Xebex.

## COUNT IV

### UNJUST ENRICHMENT

117.    Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

118.    By causing the transfers of goods from Minxing, and by accepting the goods and receiving payment in full itself, Xebex knowingly, and with specific intent to do so, has been unjustly enriched.

119.    By reason of the receipt of goods without payment therefore, Xebex has been unjustly enriched and Minxing has been damaged in an amount according to proof but not less than the Factory Cost of the goods produced and delivered, and is entitled to recover that amount, with interest, from Xebex.

## COUNT V

## PIERCING THE CORPORATE VEIL

120.    Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

121.    Weinert exercised complete dominion over Xebex's finances and its policies and business practices.

122.    Weinert is the one hundred percent (100%) owner of Xebex.

123.    Weinert is the President and Treasurer of Xebex and there are no other officers of the company.

124.    Weinert determined which bills of Xebex were to be paid and when they were to be paid.

125.    Weinert used his dominion and control over Xebex to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of Minxing's rights as a creditor of Xebex.

126.    At a time when Xebex was insolvent, Weinert was paying the bills of other companies in which he held an interest and caused Xebex to funnel two million dollars

($2,000,000.00) to RR David Company, a company based in the Philippines which he and Rowena David (his paramour) owned.

127.    At a time when Xebex was insolvent, Weinert periodically deposited corporate checks payable to Xebex into his personal account.

128.    At a time when Xebex was insolvent, Weinert caused Xebex to spend $180,000.00 in building improvements to his barn and arena at his personal residence.

129.    At a time when Xebex was insolvent, Weinert caused to sell receivables owned by Xebex and specifically directed that the proceeds of the sale be transferred to his personal account.

130.    At a time when Xebex was insolvent, Weinert personally owed Xebex large sums of money including, without limitation, at least $322,000.00 as of December 31, 2009.

131.    At a time when Xebex was insolvent, Weinert caused Xebex to purchase vehicles which were given to Weinert's family members as birthday presents or used by Weinert's children.

132.    At a time when Xebex was insolvent, Weinert conveyed property titled in Xebex to his now ex-wife as part of his divorce.

133.    At a time when Xebex was insolvent, Weinert also withdrew more than $450,000 in cash from Xebex in 2009 and caused Xebex to pay $80,000.00 to his now ex-wife during this time period.

134.    At a time when Xebex was insolvent, Weinert caused Xebex to reclassify certain transactions between him and Xebex in 2009 resulting in an $850,000.00 "reduction" in the amount Weinert allegedly owes Xebex.

135.    Weinert's control and breach of duty proximately caused the injuries and losses to Minxing.

136.    Weinert's use of Xebex and its assets as his personal bank account and effectively prevented Xebex from being able to satisfy the debts owed to Minxing.

137.    Weinert, individually, has disregarded virtually every corporate formality and utilized Xebex and its assets as his personal bank account funding his lavish personal endeavors, purchases of assets and making hundreds of thousands of dollars in improvements to real property owned by him, and payments to his ex-wife out of the company's account all of which are unrelated to Xebex's business.

138.    Weinert should be held personally liable for the debt owed to Minxing under a corporate veil piercing theory.

## COUNT VI

## ALTER EGO LIABILITY

139.    Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

140.    Weinert exercised complete dominion over Xebex's finances and its policies and business practices.

141.    Weinert is the one hundred percent (100%) owner of Xebex.

142.    Weinert is the President and Treasurer of Xebex and there are no other officers of the company.

143.    Weinert determined which bills of Xebex were to be paid and when they were to be paid.

144.    Weinert used his dominion and control over Xebex (i) to commit fraud or wrong, (ii) to perpetuate the violation of a statutory or other positive legal duty, or (iii) a dishonest and unjust act in contravention of Minxing's rights as a creditor of Xebex such that the separate corporate existence of Xebex should be disregarded and Weinert should be considered its alter ego and liable for its debts.

145.    At a time when Xebex was insolvent, Weinert was paying the bills of other companies in which he held an interest and caused Xebex to funnel two million dollars ($2,000,000.00) to RR David Company, a company based in the Philippines which he and Rowena David (his paramour) owned.

146.    At a time when Xebex was insolvent, Weinert periodically deposited corporate checks payable to Xebex into his personal account.

147.    At a time when Xebex was insolvent, Weinert caused Xebex to spend $180,000.00 in building improvements to his barn and arena at his personal residence.

148.    At a time when Xebex was insolvent, Weinert caused Xebex to sell receivables owned by Xebex and specifically directed that the proceeds of the sale be transferred to his personal account.

149.    At a time when Xebex was insolvent, Weinert personally owed Xebex large sums of money including, without limitation, at least $322,000.00 as of December 31, 2009.

150.    At a time when Xebex was insolvent, Weinert caused Xebex to purchase vehicles which were given to Weinert's family members as birthday presents or used by Weinert's children.

151.    At a time when Xebex was insolvent, Weinert conveyed property titled in Xebex to his now ex-wife as part of his divorce.

152.    At a time when Xebex was insolvent, Weinert also withdrew more than $450,000 in cash from Xebex in 2009 and caused Xebex to pay $80,000.00 to his now ex-wife during this time period.

153.    At a time when Xebex was insolvent, Weinert caused Xebex to reclassify certain transactions between him and Xebex in 2009 resulting in an $850,000.00 "reduction" in the amount Weinert allegedly owes Xebex.

154.    At a time when Xebex was insolvent, upon information and belief, Weinert withdrew large sums of cash for trips abroad, commingled Xebex funds and personal funds, used Xebex funds to support a venture in Texas which ultimately filed bankruptcy and which ventures assets were sold to a company which Weinert then went to work for.

155.    Weinert's control and breach of duty proximately caused the injuries and losses to Ricsung.

156.    Weinert's use of Xebex and its assets as his personal bank account and effectively prevented Xebex from being able to satisfy the debts owed to Ricsung.

157.    Weinert, individually, has disregarded virtually every corporate formality and utilized Xebex and its assets as his personal bank account funding his lavish personal endeavors, purchases of assets and making hundreds of thousands of dollars in improvements to real property owned by him, and payments to his ex-wife out of the company's account all of which are unrelated to Xebex's business.

158.    As a result of Weinert's disregard of the separate corporate existence of Xebex he should be considered its alter ego and held personally liable for its debts.

## COUNT VII

## FRAUD

159.    Paragraphs 1 – 36 of this Complaint are incorporated herein as though fully repleaded at length.

160.    Minxing alleges that Weinert caused Xebex to transfer its property, funds and assets to third parties at a time when Xebex was insolvent or with the intention of rendering Xebex insolvent such that Xebex would be unable to satisfy its outstanding obligations to Ricsung.

161.    As alleged above, Weinert exercised complete dominion over Xebex's finances and its policies and business practices.

162.    Weinert is the one hundred percent (100%) owner of Xebex.

163.    Weinert is the President and Treasurer of Xebex and there are no other officers of the company.

164.    Weinert determined which bill of Xebex were to be paid and when they were to be paid.

165.    Weinert used his dominion and control over Xebex (i) to commit fraud or wrong, (ii) to perpetuate the violation of a statutory or other positive legal duty, or (iii) a dishonest and unjust act in contravention of Minxing's rights as a creditor of Xebex.

166.    The transfers of funds and property of Xebex orchestrated by Weinert were clearly in fraud of Xebex's creditors and Weinert, as the sole shareholder, officer and personal with decisional control over Xebex's business decisions is liable for the fraud perpetrated against Minxing.

**WHEREFORE**, premises considered, Plaintiffs pray as follows:

**As to Defendant, Xebex:**

a.      Entry of a judgment in favor of Ricsung and against the Defendant, Xebex, for actual damages in the amount of $6,020,000, plus pre- and postjudgment interest;

b.      Entry of a judgment in favor of Ricsung and against the Defendant, Xebex, for punitive damages in the amount of $5,000,000.00 for the Defendant's willful conduct in converting Ricsung's property;

c.      In the alternative, entry of a judgment in favor of Ricsung and against the Defendant, Xebex, in the amount of  $1,543,000 representing the Agent Fees due from Xebex, and $1,090,000 representing the Factory Cost actually paid by Ricsung to factories other than Minxing, for a total of $2,633,000 plus pre- and postjudgment interest;

d.      In the alternative, entry of a judgment in favor of Minxing and against the Defendant, Xebex, for (i) actual damages in the amount of $3,387,000 representing the Factory Cost currently outstanding and owing to it plus pre- and postjudgment interest; and (ii) punitive damages in the amount of $5,000,000.00 for the Defendant, Xebex's, willful conduct in converting Minxing's property;

e.      Attorneys' fees and costs; and

f.      For such other, further and general relief to which they may be entitled.

**As to Defendant, Weinert:**

a.      Entry of a judgment in favor of Ricsung and Minxing declaring Weinert liable, under a corporate veil piercing or alter ego theory or for fraud, for the debts owed to the Plaintiffs.

b.      Entry of a judgment in favor of Ricsung and against the Defendant, Weinert, finding him liable for actual damages in the amount of $6,020,000, plus pre- and postjudgment interest;

c.      Entry of a judgment in favor of Ricsung and against the Defendant, Weinert, finding him liable for punitive damages in the amount of $5,000,000.00 for the Defendants' willful conduct in converting Ricsung's property;

d.      Entry of a judgment in favor of Ricsung and against the Defendant, Weinert, finding him liable for actual damages for fraud in the amount of $6,020,000, plus pre- and postjudgment interest;

e.      Entry of a judgment in favor of Ricsung and against the Defendant, Weinert, finding him liable for punitive damages in the amount of $5,000,000.00 for fraud;

f.      In the alternative, entry of a judgment in favor of Ricsung and against the Defendant, Weinert, finding him liable in the amount of  $1,543,000 representing the Agent Fees due from Xebex, and $1,090,000 representing the Factory Cost actually paid by Ricsung to factories other than Minxing, for a total of $2,633,000 plus pre- and postjudgment interest;

g.      In the alternative, entry of a judgment in favor of Minxing and against the Defendant, Weinert, finding him liable for (i) actual damages in the amount of $3,387,000 representing the Factory Cost currently outstanding and owing to it plus pre- and postjudgment interest; and (ii) punitive damages in the amount of $5,000,000.00 for the Defendants', willful conduct in converting Minxing's property;

h.      attorneys' fees and costs; and

i.      For such other, further and general relief to which they may be entitled.

24

**Dated: December 1, 2010**

**Respectfully submitted,**

**BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC**

/s/ James E. Bailey III
   James E. Bailey III (015979)
   R. Campbell Hillyer (022124)
6075 Poplar Avenue
Suite 500
Memphis, TN 38119
(901) 680-7200
(901) 680-7201 facsimile
jeb.bailey@butlersnow.com

**Attorneys for**
**Ricsung International Limited**
 and
**Fuijan Minhou Minxing Weaving Co. Ltd.**

Memphis 1891009v1